UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BRIANA DEWEES,
on behalf of J.M.Z., a minor,

       Plaintiff,

v.                                                                                                 CIV 15-0369 KBM

CAROLYN W. COLVIN,
Acting Commissioner of Social
Security Administration,

       Defendant.

## **MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on Plaintiff's Motion to Reverse and Remand to Agency, with Supporting Memorandum, filed on November 12, 2015 *(Doc. 20)*. Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. *See Docs. 4, 10*. Having considered the record, submissions of counsel, and relevant law, the Court finds Plaintiff's motion is well-taken and will be **GRANTED**.

**I.     Procedural History**

On June 30, 2011, Ms. Briana Dewees (Plaintiff) filed an application with the Social Security Administration for Supplemental Security Income (SSI) under Title XVI of the Social Security Act on behalf of her infant daughter, J.M.Z. (Claimant). Administrative Record[1] ("AR") at 135-44. Plaintiff alleged a disability onset date of June 1, 2011, due to a seizure disorder (epilepsy). AR at 135, 163. The agency denied

---

[1] Documents 15-1 through 15-18 comprise the sealed Administrative Record. *See Doc. 15*. The Court cites the Administrative Record's internal pagination, rather than the CM/ECF document number and page.

Plaintiff's claims initially (AR at 79-82) and upon reconsideration (AR at 88-91), and Plaintiff requested a hearing with an Administrative Law Judge (AR at 92-94).

After a *de novo* hearing at which Plaintiff testified (*see* AR at 32-61), Administrative Law Judge Ann Farris (the "ALJ") issued an unfavorable decision on July 19, 2013 (AR at 13-31). Plaintiff submitted a Request for Review of the ALJ's decision to the Appeals Council (AR at 131-34), which the Council denied on March 19, 2015 (AR at 1-7). Thus, the ALJ's decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

## II. Legal Standard

The Court must "review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005) (internal citation omitted)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161, 1166 (citation omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lax*, 489 F.3d at 1084 (quoting *Hackett*, 395 F.3d at 1172 (internal quotation omitted)). "It requires more than a scintilla, but less than a preponderance." *Id.* (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004) (alteration in original) (internal quotation omitted)). The Court will "consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but [it] will not reweigh the evidence or substitute [its] judgment for the

Commissioner's." *Id.* (quoting *Hackett*, 395 F.3d at 1172 (internal quotation marks and quotations omitted)).

"The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Id.* (quoting *Zoltanski*, 372 F.3d at 1200 (internal quotation omitted)). The Court "may not 'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zoltanski*, 372 F.3d at 1200 (internal quotation omitted)).

### III.   The ALJ's Findings

ALJ Farris made the following findings of fact and conclusions of law in her July 19, 2013 opinion:

(1)   Claimant "was born on January 28, 2011 . . . [and] was a newborn/young infant on . . . the date the application was filed, and is currently an older infant . . . ." AR at 19 (citing 20 C.F.R. § 416.926a(g)(2)).

(2)   "[C]laimant has [never] engaged in substantial gainful activity . . . ." AR at 19 (citing 20 C.F.R. §§ 416.924(b), 416.972).

(3)   "[C]laimant has the following severe impairments: seizure disorder; gastro esophageal reflux disease (GERD) . . . ." AR at 19 (citing 20 C.F.R. § 416.924(c)). The ALJ also found that "[C]laimant has ear infections" that she considered to be "a 'non-severe' impairment"; in the ALJ's opinion, they do "not cause more than minimal limitation in [C]laimant's functioning." AR at 19.

(4) "[C]laimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in" Appendix 1, Subpart P of 20 C.F.R. Pt. 404. AR at 19 (citing 20 C.F.R. §§ 416.924, 416.925, 416.926).

(5) "[C]laimant does not have an impairment or combination of impairments that functionally equals the listings . . . ." AR at 19 (citing 20 C.F.R. §§ 416.924(d), 416.926a). The ALJ mentioned that in examining the six domains, she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." AR at 19.

(6) The ALJ ultimately concluded that "[C]laimant has not been disabled, as defined in the Social Security Act, since" the date Plaintiff filed the application. AR at 28 (citing 20 C.F.R. § 416.924(a)).

## IV. Analysis

### A. Determining Disability for Children

A child is disabled for purposes of receiving SSI if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 1382c(a)(3)(C)(i). The ALJ uses a three-step sequential evaluation process to determine whether an individual under the age of 18 is disabled. 20 C.F.R. § 416.924(a); *see also Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1237 (10th Cir. 2001). At Step One, the ALJ determines whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b); *see also Briggs*, 248 F.3d at 1237. If she is, the ALJ may not find her to be disabled. 20 C.F.R. § 416.924(b). At Step Two,

the ALJ examines whether "the child has an impairment or combination of impairments that is severe . . . ." *Briggs*, 248 F.3d at 1237 (citing 20 C.F.R. § 416.924(a)); *see also* 20 C.F.R. § 416.924(c). If there are no severe impairments, the child is not disabled. 20 C.F.R. § 416.924(c). Finally, at Step Three the ALJ determines whether the child's impairment(s) "meets or equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Pt. 404." *Briggs*, 248 F.3d at 1237 (citing 20 C.F.R. § 416.924(a)); *see also* 20 C.F.R. §419.924(d).

"An impairment will be found to cause 'marked and severe functional limitations' if it meets or medically equals a listed impairment, or if it is functionally equal in severity to a listed impairment." *Brown ex rel. Brown v. Comm'r of Soc. Sec.*, 311 F. Supp. 2d 1151, 1156–57 (D. Kan. 2004) (citing 20 C.F.R. §§ 416.924(d), 416.926a). "To be functionally equivalent, the child's limitations must be at least equal in severity and duration to limitations associated with a listed impairment." *Id.* (citing 20 C.F.R. § 416.926). "The 'functionally equivalent' analysis requires the Commissioner to analyze six domains, which are 'broad areas of functioning intended to capture all of what a child can or cannot do.'" *Id.* (quoting 20 C.F.R. § 416.926a(b)(1)). The six domains to be addressed by the ALJ include: "(i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being." *Id.* (citing 20 C.F.R. § 416.926a(b)(1)(i)–(vi)).

The regulations and rulings provide guidance on the questions and factors the ALJ should consider in making findings under each of the six domains. Under the health and physical well-being domain, which is at issue here, the ALJ should "address[] how

such things as recurrent illness, the side effects of medication, and the need for ongoing treatment affect a child's body . . . ." Soc. Sec. Ruling ("SSR") 09-8p, Title XVI: Determining Childhood Disability – The Functional Equivalence Domain of "Health and Physical Well-Being," 2009 WL 396030 at *2 (Feb. 17, 2009). Physical effects may come from the impairment itself or from treatment a child receives for the impairment. *Id.*

"A child's impairment or combination of impairments functionally equals the listings and, thus, constitutes a disability under the Act, when it results in 'marked' limitations in two domains or an 'extreme' limitation in one domain, as described under the relevant regulation, 20 C.F.R. § 416.926a." *Perez v. Astrue*, No. 08-cv-02176-PAB, 2009 WL 3076259, at *4 (D. Colo. Sept. 23, 2009). In general, a limitation is "marked" when it "interferes seriously with [a claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation *very* seriously interferes with this ability. 20 C.F.R. § 416.926(e)(3)(i). In determining whether a limitation is marked or extreme, the "whole child" approach seeks answers to questions about the child's activities, limitations, and the factors involved in the limited activities to construct a picture "of the child's functioning in each domain." SSR 09-1p, Title XVI: Determining Childhood Disability under the Functional Equivalence Rule – The "Whole Child" Approach, 2009 WL 396031, at *7 (Feb. 17, 2009).

Specific to the health and physical well-being domain, a child may "have a 'marked' limitation if [the child is] frequently ill" due to the impairments or exacerbations of the impairments. 20 C.F.R. § 416.926a(e)(2)(iv). "Frequent" is defined as "episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4

months, each lasting 2 weeks or more." *Id.* Alternatively, where episodes occur more often but do not last as long, a limitation may still be "marked" "if the overall effect (based on length of the episode(s) or its frequency) is equivalent in severity." *Id.* A child has an "extreme" limitation where it is "substantially in excess of the requirements for showing a 'marked' limitation . . . ." 20 C.F.R. § 416.926(e)(3)(iv).

Notably, if a child has "episodes of illness or exacerbations of [an] impairment(s) that we would rate as 'extreme' under this definition, [the child's] impairment(s) should meet or medically equal the requirements of a listing in most cases." *Id.* (citing 20 C.F.R. §§ 416.925, 416.926). In fact, the ALJ does not even "consider a limitation in the domain of 'Health and physical well-being' unless it results from a medically determinable impairment(s)." SSR 09-8p, 2009 WL 396030, at *3. "[I]t is unlikely that a child who has a significant problem in this domain" would not also have a corresponding "impairment(s) that causes the problem." *Id.* "Therefore, if a child has a significant problem in this domain, and there is no evidence of a medically determinable impairment(s) that could be the cause of the limitations, adjudicators should ensure that they have made all necessary attempts to obtain evidence of an impairment(s) and explain any finding that there is no medically determinable impairment(s) to account for the limitations in the determination or decision." *Id.* This cautionary sentence is at the heart of the Court's decision in this case.

### B. The ALJ Erred at Steps Two and Three

Plaintiff argues that the ALJ committed reversible, legal error by failing to: (1) support the decision with substantial evidence, and (2) apply the correct legal standards. *Doc. 20* at 1. More specifically, Plaintiff argues that the ALJ erred at Step

7

Three by failing to find an extreme limitation in the domain of health and physical well-being. *Id.* at 7. Plaintiff asserts that the ALJ did not consider all of the record evidence related to an impairment under this domain, and if she had, she would have seen that substantial evidence demonstrates Claimant has an extreme limitation in the domain of health and physical well-being. *Id.* at 9. The Commissioner contends that Plaintiff has failed to demonstrate that the ALJ's analysis was insufficient. *Doc. 23* at 7.

The Court agrees that the ALJ failed to support her decision with substantial evidence. As explained more fully below, the Court finds that the ALJ did not link her findings to the evidence at either Steps Two or Three, and the Court will reverse and remand for further consideration.

### 1. The ALJ ignored a large portion of the evidence in the record.

After she determined that Claimant's impairments or combination of impairments do not meet or medically equal a listed impairment, and immediately prior to her conclusions regarding the degree of limitation in each of the six functional domains, the ALJ presented a general summary of the record evidence. *See* AR at 19-23.

The ALJ first summarized Plaintiff's testimony from the hearing. AR at 20. Notably, Plaintiff testified that Claimant's primary care physician, Dr. Maria Tapia-Sauerman, advises that Claimant not attend daycare "because of her seizure disorder and how delicate she is."[2] *See* AR at 20, 39. Plaintiff also testified about how the seizures and the seizure medications affect Claimant, Claimant's respiratory problems, and Claimant's abilities. *Id.*

---

[2] Dr. Tapia-Sauerman's letter dated August 27, 2013 recommends that Claimant not attend daycare "due to her age and active seizure disorder . . . ." AR at 575. The ALJ would not have seen this letter, as the de novo hearing took place on May 15, 2013, and the ALJ issued her opinion on July 19, 2013. AR at 28.

8

The ALJ then summarized the record evidence. AR at 21-23. Plaintiff contends the ALJ erred in that she failed to mention or consider Claimant's "GERD and upper respiratory illnesses, the number of hospitalizations, the additional medical equipment [Claimant] needs, the after effects of a seizure, and the dosage and side effects of her medications." *Doc. 20* at 12 (citing AR at 28). The Court will summarize the evidence – both what the ALJ mentioned and what she did not – for each of the contested categories.

GERD: The ALJ noted the following evidence with respect to Claimant's GERD: (1) Plaintiff's testimony regarding Claimant's milk intolerance that has since resolved (AR at 20); (2) Claimant's May 2, 2011 GERD diagnosis (AR at 22, 292, 556); (3) Claimant's June 7, 2011 hospitalization due to emesis (vomiting) followed by a seizure (AR at 21, 221); (4) Dr. Abby Kunz's report noting an episode of emesis followed by possible seizure activity in late January, 2012 (AR at 22, 491, 542-43); and (5) notes from a September 22, 2012 emergency room visit due to vomiting where Claimant was prescribed Zofran for nausea or vomiting and given instructions for a diet for vomiting/diarrhea (AR at 22, 505, 509).

The ALJ failed to cite the following record evidence relevant to GERD: (1) notes from visits to two different providers on February 15 and 16, 2011, because Claimant was not "keeping anything down" and was "positive for congestion" (AR at 218, 280-81); (2) Dr. Tapia-Sauerman counseled Plaintiff about reflux precautions and possible treatment at Claimant's March 28, 2011 Well Child Visit (AR at 283-84); (3) Dr. Mariska Wensink noted during an April 27, 2011 office visit that Claimant's formula intolerance and spitting up is gradually worsening (AR at 289); (4) the ALJ mentioned Claimant's

9

July 6, 2011 hospitalization for seizures (AR at 21) but did not note that Claimant had "frequent emesis and desaturation following feeds that correlated clinically with" GERD (AR at 422); Dr. Erin Rust gave Claimant "a trial of Prevacid, thickened feeds and reflux precautions" (AR at 422); (5) Dr. Tapia-Sauerman noted on October 10, 2011 that Claimant "[w]as on prevacid (seemed to do well)[, weaned] off, now issues again[; p]ut back on prevacid last night" (AR at 479); (6) Dr. Alice Luna noted vomiting during an October 21, 2011 visit for congestion and sinusitis (AR at 562-63); (7) Dr. Tapia-Sauerman noted on November 17, 2011, that Claimant's reflux was well controlled and recommended she continue prevacid (AR at 558-59); (8) Dr. Tapia-Sauerman saw Claimant on March 22, 2012 due to a "[w]et cough on/off over a couple of months" and emesis (AR at 529-30); and (9) Dr. Tapia-Sauerman's March 18, 2013 note reporting fever and emesis (AR at 514-15).

Respiratory Illnesses: The ALJ noted the following with respect to Claimant's respiratory illnesses: (1) Plaintiff's testimony regarding Claimant's respiratory issues, including: reports of "respiratory problems since birth"; "congestion, upper respiratory infections and croup"; "hospitalized for three days" due to croup; uses albuterol, more often during winter months (about eight times in the winter of 2012–13) (AR at 20); (2) at the June 7, 2011 hospitalization for seizures, Plaintiff reported that Claimant "had an upper respiratory infection for several days" prior to admission (AR at 21); and (3) Claimant had a possible seizure in December 2011 during a bout of croup (AR at 22, 491).

The ALJ failed to cite numerous instances from the record concerning Claimant's respiratory illnesses: (1) notes from visits to two different providers on February 15 and

16, 2011, because Claimant was not "keeping anything down" and was "positive for congestion" (AR at 218, 280-81); (2) Dr. Tapia-Sauerman diagnosed bronchiolitis during a May 5, 2011 follow-up visit due to Claimant's congestion and wheezing (AR at 295-96); (3) Dr. Tapia-Sauerman diagnosed an upper respiratory infection during an October 10, 2011 office visit (AR at 475, 479); (4) Dr. Luna noted ongoing congestion (for weeks) with cough, diagnosed sinusitis, and prescribed amoxicillin during an October 21, 2011 office visit (AR at 562-63); (5) Dr. Tapia-Sauerman saw Claimant on October 27, 2011 for a follow-up appointment on her sinus infection (AR at 560-61); (6) The ALJ did not mention that during Claimant's December 2, 2011 bout of croup accompanied by a possible seizure, Claimant received decadron and albuterol nebulizers at the emergency room due to bronchospasm (*id.* at 556–57); (7) Dr. Tapia-Sauerman diagnosed Claimant with bronchospasm, counseled Plaintiff on possible asthma, and prescribed an albuterol nebulizer on December 3, 2011 (AR at 554-55); (8) Dr. Tapia-Sauerman reported on January 10, 2012 that Claimant had been seen over the weekend in the emergency room for a croupy cough and received a decadron shot (AR at 548–49); (9) Dr. Tapia-Sauerman saw Claimant on January 12, 2012 for congestion (greater than a week) and a wet cough, diagnosed her with acute bronchitis, and prescribed Azithromycin (AR at 546-47); (10) Claimant went to the emergency room on February 1, 2012, for a wet cough and congestion, saw Dr. Tapia-Sauerman on February 2, 2012, and was hospitalized on February 3, 2012, due to bronchiolitis/RSV; she was treated with an albuterol nebulizer (AR at 535-39, 541, 567); (11) Dr. Tapia-Sauerman diagnosed Claimant with an upper respiratory infection during an office visit on March 6, 2012 (AR at 531-32); (12) Dr. Tapia-Sauerman saw Claimant on March 22,

2012 due to a "[w]et cough on/off over a couple of months" and emesis; she diagnosed claimant with bronchitis, a cough, and acute otitis media (middle ear infection) and prescribed Azithromycin. AR at 529-30. Dr. Tapia-Sauerman noted that Claimant's last albuterol use was two months prior to the visit due to a bronchiolitis episode. AR at 529; (13) Dr. Luna saw Claimant for a croupy cough on October 12, 2012, and recommended vapor and fluids (AR at 522-23); and (14) Dr. Luna saw Claimant for a croupy cough on November 15, 2012. AR at 520. Dr. Luna reported that Plaintiff said Claimant "has had croup [five] times this year and has been given decadron each time." Because Dr. Luna was concerned about possible side effects of decadron, she counseled Plaintiff to use "vapor and supportive care." *Id.*

Hospitalizations: Claimant has been hospitalized five times for her illnesses: (1) June 7-8, 2011, for febrile seizures after emesis (AR at 359-60); (2) June 13-15, 2011, for seizures not associated with fever (AR at 387-89) ; (3) July 4-5, 2011, for increasing seizure activity (AR at 409-11); (4) July 6-14, 2011, for seizures and GERD (AR at 422-23); and (5) February 3, 2012, due to bronchiolitis/RSV (AR at 535-39, 541, 567). The ALJ mentioned only the first three hospitalizations, but she did note that Claimant had an EEG on July 7, 2011, which was part of the fourth hospitalization. AR at 21.

Medical Equipment: The ALJ noted from Plaintiff's testimony that Plaintiff utilizes an oximeter, oxygen tank, and apnea monitor "to detect desaturation during a seizure and provide supplemental oxygen until [Claimant] can be taken to the hospital." *Doc. 20* at 11; *see also* AR at 20, 49, 318, 425. Plaintiff does not specify what medical equipment Claimant uses that the ALJ missed, and the Court cannot find other equipment listed in the record. *See Doc. 20* at 10-12.

Effects of Seizures: The ALJ noted from Plaintiff's testimony that seizures completely drain Claimant – "[s]he will sleep the rest of the day and half of the next day." AR at 20, 52–53. Plaintiff believes the seizures make her sore, because after a seizure Claimant "doesn't really use the muscle tension," so Plaintiff gives her Tylenol for pain. AR at 52. Plaintiff does not point to any other after-effects of the seizures that the ALJ did not mention. *See Doc. 20* at 10-11.

Medications (Dosages and Side Effects): The ALJ noted that Claimant has been on increasing dosages of seizure medications, including Keppra, Trileptal, vitamin B-6, and Diastat, since her second hospitalization on June 13, 2011.[3] *See, e.g.*, AR at 21-22, 312, 319, 381, 410, 425, 489-90, 565. The ALJ also mentioned Plaintiff's report that the regular seizure medication makes Claimant hyperactive for twenty minutes to an hour after she takes it. AR at 20, 53-54.

The ALJ failed to mention that Claimant's neurologist, Dr. Abby Kunz, noted on February 2, 2012, that Claimant's seizures seem to be "exacerbated by fever" (AR at 492), and both Dr. Tapia-Sauerman and Dr. Luna have noted on several occasions that Claimant's seizure threshold is "lowered with illness" – these notes occur on October 13, 2011 (worried ear infection will lower seizure threshold) (AR at 486), December 2, 2011 (bronchospasm followed by seizures) (AR at 556), January 27, 2012 (emesis followed by seizure) (AR at 542), February 2, 2012 (noting seizures usually appear with illness) (AR at 540), June 19, 2012 (noting seizures usually occur with illness) (AR at 527), November 15, 2012 (treating croup and noting that Claimant has had seizures

---

[3] Dr. Kunz remarked in May 2014 that Claimant is on "rather high doses of seizure medication[,]" but even so, the doses are "not likely to provide full coverage for" Claimant. AR at 10.

with croup in the past) (AR at 520), and March 18, 2013 (treating for fever and emesis, noting seizure threshold is lower with illness) (AR at 514).

The ALJ also failed to mention that Claimant's physicians tend to be "cautious and aggressive [in] treating" her illnesses, often giving Claimant decadron shots and albuterol nebulizers for respiratory issues, because her seizures seem to be linked to illness. *See, e.g.*, AR at 520, 522, 541, 556. The ALJ also failed to note that at least Dr. Luna is "concerned with the repeated doses of decadron possibly having some side effect." AR at 520.

### 2. The ALJ did not explain her failure to discuss a large portion of the evidence.

Plaintiff contends that the ALJ erred in failing to take Claimant's multiple GERD- and upper respiratory-related illnesses into account when determining whether Claimant has a marked or extreme limitation. Plaintiff argues that if she had (and if she had properly applied the regulations), the ALJ would have found an "extreme" limitation in this domain. *Doc. 20* at 7-12. The Commissioner counters that the ALJ adequately discussed the evidence of record and that Plaintiff is simply asking the Court to reweigh the evidence. *Doc. 23* at 6.

The Court agrees with Plaintiff that the ALJ seemingly ignored a large portion of the record evidence in her summary. The ALJ mentioned four of Claimant's five hospitalizations and all six recorded instances of seizures, but only five of approximately ten recorded instances of GERD-related symptoms, and only two of approximately fifteen recorded instances of respiratory illnesses.

"Without explanation, the ALJ passed over significant probative record evidence" concerning Claimant's office and emergency room visits related to GERD and upper respiratory illnesses. *See Briggs*, 248 F.3d at 1239. The ALJ failed to not only consider these recurrent illnesses, but also their effects on Claimant: at least two physicians noted that these illnesses lower her seizure threshold, making it more likely that she will have seizures, and at least one physician is concerned about the side effects of one of the medications (decadron) Claimant repeatedly receives when she gets an upper respiratory infection. The Court is hard-pressed to find that substantial evidence supports the ALJ's findings when the evidence she considered "is overwhelmed by other evidence in the record. . . ." *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004 (quotation omitted)).

It is error for an ALJ to ignore significant probative evidence that contradicts her findings. *Smith ex rel E.S.D. v. Barnhart*, 157 F. App'x 57, 63 (10th Cir. 2005). "Although an ALJ need not consider every piece of evidence in the record, [s]he must 'discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects.'" *Id.* (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (internal citations omitted)). "Stated differently, '[i]t is improper for the ALJ to pick and choose among . . . reports, using evidence favorable to [her] position while ignoring other evidence.'" *Id.* (quoting *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (internal citation omitted)).

And while the Court is mindful that the ALJ does not "consider a limitation in the domain of 'Health and physical well-being' unless it results from a medically determinable impairment(s)[,]" SSR 09-8p, 2009 WL 396030, at *3, it is unclear from the

15

ALJ's findings if she even considered whether Claimant's upper respiratory illnesses constituted an impairment at Step Two.

### 3. The ALJ did not link her findings to the record.

ALJ Farris found that Claimant had "no limitation" in the first five domains; Plaintiff does not raise any issues with this portion of the ALJ's decision. AR at 23-27. The ALJ determined that Claimant had a "marked limitation" in the sixth domain – health and physical well-being. AR at 28. Plaintiff contends that the ALJ failed to apply the "whole child" approach in accordance with Social Security Ruling 09-1p when making her findings on functional equivalence. *Doc. 20* at 8-10. The Commissioner disagrees but fails to point to any part of the ALJ's opinion that is indicative of anything more than boilerplate recitations of the regulations and rulings. *See Doc. 23.*

The Court finds that the ALJ failed to demonstrate that she followed the appropriate regulations and to link her findings to the evidence of record. Here, the ALJ provided conclusory determinations for Steps One and Two. Following her summary of the record, the ALJ described the six domains of function and made brief findings under each domain. AR at 23-28. In finding Claimant has a "marked" limitation in the health and physical well-being domain, the ALJ wrote just one sentence: the Claimant "needs careful monitoring and medication secondary to seizure disorder . . . ." AR at 28. In a parenthetical following the sentence, the ALJ noted her reliance on the "mother's testimony" and "medical evidence" to support her conclusion. *Id.* "The ALJ did not explain how [s]he made [her] findings or analyze the evidence." *Ortiz v. Colvin*, Civ. No. 15-0487 CG, Doc. 27, at *9 (D.N.M. Apr. 26, 2016).

While the ALJ is not required "to discuss all of the considerations" on which she based her "determinations and decisions," she must "provide sufficient detail so that any subsequent reviewers can understand how [she] made [her] findings." SSR 09-1p, 2009 WL 396031, at *3; *see also Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000) (the ALJ must "carefully consider[] all [of] the relevant evidence and link[] [her] findings to specific evidence" (citing *Clifton*, 79 F.3d at 1009-10)). "When, as here, the ALJ makes findings only about the claimant's limitations and the remainder of the . . . assessment takes place in the [ALJ's] head, [the Court] is left with nothing to review." *Winfrey v. Chater*, 92 F.3d 1017, 1025 (10th Cir. 1996).

Because the ALJ did not adequately tie her conclusions to specific findings at any of the steps in the three-step process, the Court is left to wonder whether she considered or disregarded almost every piece of evidence regarding Claimant's persistent upper respiratory illnesses, and approximately half of the instances of Claimant's GERD-related illnesses. "In the absence of ALJ findings supported by specific weighing of the evidence, [the Court] cannot assess whether relevant evidence adequately supports the ALJ's conclusion that [Claimant's] impairments did not meet or equal any Listed Impairment, and whether [she] applied the correct legal standards to arrive at that conclusion." *Clifton*, 79 F.3d at 1009. On remand, the ALJ shall tie her conclusions to the evidence of record and adequately demonstrate that she applied the correct legal standards.

### 4. The ALJ did not properly evaluate Plaintiff's credibility.

Finally, while Plaintiff did not raise a question about the ALJ's credibility determination, the Court finds it appropriate to raise *sua sponte*. "In *Briggs*, the Tenth

17

Circuit stated that '[i]f the child claimant is unable to adequately describe his symptoms, the ALJ must accept the testimony of the person most familiar with the child's condition." *Lucero ex rel. J.L. v. Astrue*, No. 09-cv-02834-WJM-BNB, 2012 WL 1414382, at *8 (D. Colo. Mar. 13, 2012), R. & R. adopted, 2012 WL 1415009 (D. Colo. Apr. 24, 2012) (quoting *Briggs*, 248 F.3d at 1239 (citing 20 C.F.R. § 416.928(a))). "In such a case, the ALJ must make specific findings concerning the credibility of the parent's testimony, just as he would if the child were testifying." *Id.* (quoting *Briggs*, 248 F.3d at 1239 (internal citation omitted)).

      Here, the ALJ concluded that "[C]laimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms" as testified to by Plaintiff. AR at 20. The ALJ found, however, that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [C]laimant's symptoms are not credible to the extent they are inconsistent with finding that [C]laimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below." AR at 20-21.

      "The ALJ does not explain what specific evidence leads her to discount the testimony; instead, the ALJ expresses that she disagrees with the testimony simply because it does not match her conclusion. This explanation is too vague." *J.L.*, 2012 WL 1414382, at *8 (quotation and internal citation omitted.) The ALJ's "[s]tandard boilerplate language will not suffice." *Briggs*, 248 F.3d at 1239 (citing SSR 96-7p, Policy Interpretation Ruling Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, S.S.R. 96-7p, 1996 WL 374186, at *4 (July 2, 1996) ("stating that credibility determinations [cannot] be based on

intangible or intuitive reasons; rather they 'must be grounded in the evidence and articulated in the determination or decision'"); *see also Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) ("stating that a credibility determination 'should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings'" (internal quotation and citations omitted)). On remand, the ALJ should revisit her credibility determination and make more specific findings.[4]

## IV.   Conclusion

The Court finds that because the ALJ failed to consider a large portion of the evidence, demonstrate that she followed the appropriate regulations, link her findings to the evidence of record, and make specific findings regarding her credibility determination, it is appropriate to reverse the Commissioner's decision and remand the matter for further development of the record.

The Court takes notice that Plaintiff has filed a second application for SSI benefits. *Doc. 20 at 3* n.1. On remand, the Commissioner shall consolidate Plaintiff's claims, and the ALJ shall consider them together.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse and Remand to Agency, with Supporting Memorandum *(Doc. 20)*, is **GRANTED**.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE
Presiding by Consent

---

[4] The Court is mindful that effective March 28, 2016, the SSR 96-7p "credibility" analysis was rescinded and was replaced by SSR 16-3p which now controls the "Evaluation of Symptoms" analysis.